**E-FILED**

Monday, 25 June, 2007 01:32:29PM

Clerk, U.S. District Court, ILCD

FOR THE UNITED STATES DISTRICT

COURTS OF AMERICA

**FILED**

SIMON A. LUNDY
Case No. 03-10064-001
Reg. No. 16585-424-C
Federal Correctional Institution
P.O. BOX 1000
Sandstone, MN 55072

June 21, 2007

JUN 2 5 2007

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

07-1167

## CRIMINAL COMPLAINT
## MANDATORY NOTICE OF MISPRISON OF FELONY

**COMES NOW,** SIMON LUNDY to **Notice** this Court pursuant to its Federal
Rules of Evidence, Rule 201 (d), to mandatorily investigate and charge
the person(s) involved in the Commission of Crime(s) as set forth to
Title 18 U.S.C. § 4, Misprison of Felony.

### LIST OF ACTORS AND ALLEGED CRIMES

The list of characters who carried on this malicious prosecution and
acted in concert/collusion, under color of law, liable in their private
and official capacities, jointly and severally, as all were in violation of
their ethical code and their sworn oaths of office to uphold the very laws
they violated, on the United States. All involved have knowingly and
willfully waived their corporate immunity, and their actions have allowed
the "piercing of the corporate veil" as the evidence, all theirs by the
way, clearly shows. The men and women who are involved here are as follows:
Kendall T. Chambers, ausa) Bradley Murphy,ausa) Genise Bailey,po) Paul
Larsen,dea) Diondre L. Wakefield,ci).

### PROOF OF EVIDENCE

All or any portion of evidence can be located through the Federal
Bureau of Investigations (FBI). The Department of Justice (DOJ). The Central
District of Illinois, Federal Court Building 100 NE Monroe Peoria, Illinois
61602. Simon Lundy criminal case number 03-10064-001.

### START §

Mr. Simon A. Lundy, Sr.
Reg. No. 16585-424-C
Federal Correctional Institution
FCI, Sandstone
P.O. Box 1000
Sandstone, MN 55072
Federal Case No. 03-10064-001

Prepared For: The District Court Building
100 N.E. Monroe Street
Peoria, Illinois 61602

May 23, 2007

## FORMAL COMPLAINT

### PROSECUTORIAL MISCONDUCT

I, Mr. Simon A. Lundy, Sr., am pursuing this complaint under Title 18 U.S.C. § 4, Misprison of Felony, against Assistant U.S. Attorney Kendall Tate Chambers, of the Central District of Illinois, Peoria. In this Formal Complaint, Mr. Lundy will, with "merit," establish two charges against Assistant U.S. Attorney Kendall Tate Chambers.

### (1) CONSPIRED GUILTY PLEA

### (2) COMPELLED ADVERSE INTERESTS

On September 15, 2005, an unknown source requested the administrative assistant of District Judge Michael M. Mihm, to schedule an appearance for Mr. Lundy to appear in courtroom C, at 4:30 P.M., on September 16, 2005, for a "CHANGE OF PLEA HEARING."

Mr. Lundy's then attorney, Thomas Reinhard Iben, testified that he was not the source who requested the judge's administrative assistant to schedule the appearance of Mr. Lundy for a "CHANGE OF PLEA HEARING."

Mr. Lundy's present attorney, Phillip J. Kavanaugh, traveled to Peoria, Illinois, to investigate who the source was that requested the judge's administrative assistant to order the appearance of Mr. Lundy for a "CHANGE OF PLEA HEARING."

Mr. Lundy's attorney, in a letter addressed to Mr. Lundy and dated October 13, 2007, stated that upon his investigation, he discovered that the judge's administrative assistant ordered Mr. Lundy to the courthouse to explore plea agreements and that he was unable to find out who the source was who requested the judge's administrative assistant to schedule the hearing.

1.

On September 16, 2005, Mr. Lundy was escorted by two Deputy Sheriff Officers, at 7:00 A.M., from the Knox County Jail, on a 45-minute drive to the Federal Court Building, for a meeting with his then attorney, Thomas R. Iben.

Mr. Lundy arrived at approximately 7:45 A.M. At 8:00 A.M., Mr. Lundy's attorney entered the holding cell block accompanied by Mr. Lundy's then former attorney, Federal Public Defender, Robert Andre Alvarado, who was previously terminated from Mr. Lundy's case due to a conflict of interest.

Both attorneys testified that after over an hour of trying to persuade Mr. Lundy to plead guilty, Mr. Lundy refused their offers.

Afterwords, Mr. Lundy was made to stay in a deserted, dim, cold cell-block for an additional 7 hours, with the idea that he was waiting for the two Deputy Sheriff Officers to transport him back to the Knox County Jail.

At approximately 4:15 P.M., Mr. Lundy's attorney, Thomas R. Iben, returned to the cell-block alone. Attorney Iben then offered Mr. Lundy a worthless "concession" in which Mr. Lundy accepted.

Instantly after Mr. Lundy agreed, someone yelled through the intercom speaker, the judge is waiting for Mr. Lundy in Courtroom C.

## CONCLUSION
### "CONSPIRED CHANGE OF PLEA HEARING"

There are only three sources with the authority who could have made the request for the administrative assistant to schedule Mr. Lundy to appear in court:

(1)  The District Judge Michael M. Mihm;

(2)  The Prosecutor, AUSA Kendall Tate Chambers; or

(3)  The Counsel for Mr. Lundy, Thomas Reinhard Iben.

The administrative assistant reported that Mr. Lundy was brought to the courthouse to explore plea agreements, scheduled for the 16th of September, 2005.

Mr. Lundy's "Docket Report" states that Mr. Lundy was brought to the courthouse for a "CHANGE OF PLEA HEARING" scheduled for the 16th of September, 2005.

The counsel for Mr. Lundy testified that he is not the source who scheduled either appointment with the administrative assistant.

On September 15, 2005, the administrative assistant for the judge scheduled a "CHANGE OF PLEA HEARING" for the 16th of September, 2005, a day in advance of Mr. Lundy accepting the change of plea.

2.

The Judge is not the source of this "CHANGE OF PLEA HEARING."

The Defense Counsel is not the source of this "CHANGE OF PLEA HEARING."

Therefore, the only source with the authority to request this premature "CHANGE OF PLEA-HEARING," is the prosecutor, Kendall Tate Chambers.

## CONSPIRED GUILTY PLEA

---

### COMPELLED ADVERSE INTERESTS

All in all, the Government provided the appointment of six Defense Counsels for this case.

1) Robert A. Alvarado;

2) Arthur J. Inman;

3) Thomas R. Iben;

4) John P. Lonergan;

5) Jeffery L. Flanagan; and

6) Phillip J. Kavanaugh.

Attorney Robert A. Alvarado, the first attorney appointed to Mr. Lundy's case, was terminated after six months of legal representation, and within a week of trial.

Attorney Alvarado was terminated because of his working relationship within the same office of his co-worker, George Taseff, who represented Mr. Lundy's co-defendant, Diondre L. Wakefield, on an unrelated case a year prior.

Attorney Alvarado reemerged on the eve before Mr. Lundy's final trial date, a year after his termination, and revealed his and the Government's interest in a separate case that Mr. Lundy's co-defendant, Diondre L. Wakefield, was an informer for and testifying on behalf of the Government.

Attorney Alvarado stated that if Mr. Lundy's case proceeded to trial before the case of interest, then the Government's informer Diondre L. Wakefield's credibility would jeopardize the Government's case of interest.

### COMPELLED CASES OF ADVERSE INTERESTS

### PROSECUTOR ASSISTANT U.S. ATTORNEY KENDALL TATE CHAMBERS

1) Diondre L. Wakefield & Simon A. Lundy

2) Ricky A. Hurt

3) Sylvester Mickle & Marvell Thompson

4) Shane Williams & Timothy Bailey

5) Dwaune Johnson

In this Formal Complaint of Adverse Interest against AUSA Chambers, Mr. Lundy will, with "merit," establish **Compelled Adverse Interests.**

## STATEMENT OF FACTS

On October 22, 2002, Diondre L. Wakefield was arrested by the Peoria County Police Department and subsequently charged with conspiracy to sell, distribute, or dispense a Schedule II controlled substance.

On June 18, 2003, Simon A. Lundy was indicted and subsequently arrested by two Chicago Police Officers and charged with conspiracy to sell, distribute, or dispense narcotics.

On the date of 11/13/2000, government informer and Black Disciple gang member Michael D. Williams, aka BD Mike, black male, born 02/10/1974, Social Security Account Number 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, residing at 205 S. Webster Street, Peoria, Illinois, was interviewed at the Peoria County Jail, 410 W. Maxwell Road Peoria, pursuant to a Proffer Agreement arranged by Assistant United States Attorney K. Tate Chambers and Mr. Williams' attorney, Assistant Federal Public Defender, Ivan Davis. Investigator Philip Geier was present during the interview. Michael D. Williams furnished the following information:

Shane Williams, a (BD) gang member, black male, born in 1974, provided Michael D. Williams with information that (BD) member Shone L. Jones, aka BD Shone, black male, born 07/29/1973, had recently retrieved all remaining firearms from a location where Michael D. Williams had previously secured them and moved the firearms to an unknown location for safe keeping. Michael Williams suspects Jones did this at the direction of Sylvester Mickle, aka Star, black male, born 01/07/1973, the recognized leader of the Peoria Black Disciple (BD) street gang.

Michael Williams contacted Peoria BD member Ricky A. Hurt at the telephone number of Hurt's girlfriend, Deyuna D. Suber: (309)686-8069. Hurt informed Michael Williams that Mickle and Chicago BD member John, aka Big John, were together in Peoria inquiring about the status of Michael Williams' present criminal case as well as the status of other Peoria BD members presently incarcerated in the Peoria County Jail. Hurt further indicated he had been avoiding Sylvester Mickle and Chicago BD members in Peoria as he suspected they intended to do bodily harm to him.

On 11/20/2000, John Tyrone Williams, aka T.Y., black male, born 03/21/1971, Social Security Account Number 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, residing at 708 S. Helen Street,

4.

Peoria, Illinois, was interviewed at the Peoria Federal Building pursuant to a Proffer Agreement arranged by Assistant United States Attorney K. Tate Chambers, investigator Philip Geier, and John Williams' attorney, Federal Public Defender, Ivan Davis. John Williams furnished the following information:

That upon being release from Illinois Department of Corrections in April of 1991, he was subsequently initiated into the ranks of the Black Disciples (BD) street gang by his cousin, Sylvester Mickle, aka Star, Clarence Peterson, aka Big Shawn, black male, born 05/13/1975, and Marvell Thompson, recognized as the King of the Black Disciple Nation (BDN). John Williams informed the government that his cousin Sylvester Mickle also had a twin brother selling narcotics on the far south side of Chicago, named Allen S. Mickle, black male, born 01/07/73. Both twins known on the streets as Star and Allen. John Williams said during April of 1991, that Mickle's father Sylvester Williams, aka Obay, black male, born 11/27/1950, also a BD member, moved from his residence at E. 118th Street and Indiana Avenue to Peoria. Shortly thereafter, the father contacted his sons to inform them that Peoria was much more lucrative than Chicago, for the street sales market for crack cocaine.

Shortly thereafter, Sylvester Mickle informed Thompson and Peterson of this and plans were formulated to move to Peoria and establish a BD controlled crack cocaine distribution organization. John Williams further estimated the total gross monetary profit from all BD sales of crack cocaine in Peoria during this time period to be approximately ten million dollars.

John Williams also alleged that all profits from the sales of narcotics from the Peoria area were given to Sylvester Mickle and Marvell Thompson. John Williams further states that: Sylvester Mickle and Marvell Thompson ordered several murders in Peoria and Chicago.

On 09/06/2000, BD informer for the government Michael D. Williams, aka BD Mike, informed the AUSA K. Tate Chambers, that he purchased firearms for the security of the BDs in Peoria from a black female named Chris LNU, mid 40s, who obtained the firearms from a Robert DeFederico, white male, 50s, who resides in Chillicothe, Illinois. Michael Williams has purchased several AK-47 and SKS-type 7.62x39mm semiautomatic rifles and ammunition; .38 Special and .357 Magnum caliber revolvers and 9mm and .45 ACP caliber semiautomatic pistols from Chris. Within six months prior to Michael Williams' arrest, Michael Williams purchased two Smith & Wesson .357 Magnum revolvers; one Smith & Wesson 9mm semiautomatic pistol; one Ruger .44 Magnum Super Redhank revolver; two

5.

AMT .30 caliber carbine semiautomatic rifles; and one, brand/model unknown,
center-fire rifle. Michael Williams agreed to covertly try to recover as many
of these firearms as possible, through a third-party, and turn them over to
the FBI.

In 1995, a Peoria Gangster Disciple (GD) member shot Peoria BD member
**Ricky A. Hurt,** in the face as he sat in a parked car on W. Howett Street near
S. Western Avenue on Peoria's South Side. Hurt survived the shooting, which
left his face partially paralyzed.

As Hurt was recovering, a gangland war kicked off. After the Hurt shooting,
the Peoria BD basically saturated the Warner Homes which, before then, shared
the initial resistance of the GD as well as that of the Black P. Stones street
gang (BPS) and factions of the Vice Lords (VL) street gang. This resulted
in numerous shooting incidents, both in the Warner Homes and the GD controlled
Harrison Homes public housing project on Peoria's far south side. Michael
Williams, along with **Ricky A. Hurt,** Shone Jones, Jermyn Perry and Roy LNU,
a Chicago BD member operating in Peoria, were responsible for most of the shooting
engaged in by the Black Disciples.

In 1997 or 1998, Sylvester Mickle became angry at **Ricky A. Hurt,** who was
not paying BD taxes to Mickle on the crack cocaine he sold. Mickle sent his
cousins, John T. Williams, aka T.Y., and Shone Jones, aka BD Shone, to rob
Hurt. John T.Y. Williams and Jones broke into Hurt's apartment and stole some
money which was given to Mickle.

Hurt discovered the burglary, learned that John T.Y. Williams and Jones
were involved and subsequently went to John Williams' apartment on W. College
Street to confront him. Upon arriving there, Hurt knocked on the door which
was answered by John Williams who, upon seeing Hurt, closed the door. Hurt
then fired his pistol through the door, wounding John T.Y. Williams in the
chest, then fled the area. John T.Y. Williams ultimately recovered from his
gunshot wound, however, the incident angered Mickle who then began planning
to murder **Ricky A. Hurt.**

In the summer of 1999, **Ricky A. Hurt** was involved in a romantic relationship
with Angela Watkins, aka Angie, the current girlfriend of Terell Walker, aka
Goody, a member of the Cicero Insane (CI) faction of the VL and a local drug
and weapons dealer.

Angela Watkins kept large sums of drug money for Terell Walker and confided
this information to Hurt. Hurt told Sylvester Mickle about this and Mickle

6.

ordered Hurt to steal the money, however, Hurt refused to do so because of
the position it would place Watkins in. Angered and frustrated at Hurt, Mickle
ordered Peoria BD member Gregory N. Minnix, aka Fat G., black male, born 12/26/1979,
to rob Watkins of Walker's drug money. Minnix, possibly with another BD member,
subsequently robbed Watkins at gunpoint and gave the money to Sylvester Mickle.

Terell Walker, upon learning of the robbery, suspected Hurt was involved
because he had discovered Hurt and Watkins were having an affair. Walker subsequently
directly or indirectly contacted Sylvester Mickle and demanded his money back,
which Mickle denied having. Hurt attempted to convince Mickle to give Walker
a portion of the money back, however, Mickle refused to do so. Walker then
began threatening to kill Hurt if the money was not returned and gave Hurt
a deadline to do so.

Gregory Minnex, was subsequently shot and killed on Peoria's North Side,
possibly by Chris L. Tillman, black male, born 09/11/1976, a member of the
Four Corner Hustler (4CH) faction of the VL, on the orders of Walker pertaining
to the robbery of Watkins.

In early September, 1999, approximately two days prior to Walker's imposed
deadline to Hurt, Sylvester Mickle saw Walker driving a new pickup truck on
Peoria's South Side. Later that night, Ocasio Grant, aka Casio, black male,
born 04/29/1979, a former GD member who renounced his GD membership and joined
the Peoria BD, shot and killed Walker at a car wash on N. Western Avenue where
Walker was washing his truck. **Ricky A. Hurt** may have been with Grant when
the murder, which was ordered by Mickle, was committed.

Local law enforcement subsequently recovered two pistols and two ski masks
abandoned near the murder scene.

Government informer Michael Williams further indicated it was a violation
of BD law to leave any firearm behind at or near the scene of a crime involving
the crime. It was also a violation to discard drugs when being pursued by
rival street gang members or law enforcement officers. Michael Williams indicated
Grant and **Ricky Hurt** should have never left their pistols and ski masks behind
near the scene of Gregory Walker's murder. For this violation, some type of
disciplinary action should have been taken against them by Sylvester Mickle.

On September 14, 2000, government informer Michael D. Williams called
Sylvester Mickle from the Peoria County Jail, who inquired about the status
of his criminal case. Sylvester Mickle then confided he was concerned about
Peoria BD member John T.Y. Williams and Shone L. Jones, who he knew to be wanted

7.

on a local felony warrant, cooperating with the government. Sylvester Mickle
then apologized to Michael Williams for suspecting him of cooperating and indicated
he would make arrangements to have money placed on Michael Williams' PCJ commissary
account and to forward a pre-paid telephone calling card to him for future
use.

Sylvester Mickle inquired if John Williams had recently talked to Peoria
BD member **Ricky A. Hurt** and indicated he had been unsuccessful in numerous
attempts to persuade Hurt to come to Chicago. Michael Williams suspects the
real reason Sylvester Mickle is trying to persuade Hurt to come to Chicago
is to have him killed by other BD members, as Marvell Thompson blames all the
negative publicity the Peoria BDs are receiving on Hurt. Hurt is aware of
this and thus far has successfully avoided any direct contact with Sylvester
Mickle, Allen Mickle and Marvell Thompson.

In the year 2002, Sylvester Mickle is no longer purchasing kilogram quantities
of powder cocaine from Marvell Thompson because Thompson is angry at Mickle
for all of the publicity the Peoria BD have recently been receiving as a result
of numerous shooting incidents with rival street gang members. Thompson blames
these incidents on **Ricky A. Hurt** and is angry that Mickle cannot better control
Hurt and the Peoria BD members involved. Thompson, in all probability, would
like to have **Ricky A. Hurt** killed, preferable in Chicago, and has instructed
Mickle to lure him there. Thus far, Mickle has been unsuccessful.

## ARGUMENT

In early 2003, government informer **Diondre L. Wakefield** was interviewed
pursuant to a Proffer Agreement arranged by Assistant United States Attorney
K. Tate Chambers. Wakefield's proffer statement was against **Timothy Bailey.**

In early 2003, **Timothy Bailey & Shane Williams** both signed Proffer Agreements
against **Ricky A. Hurt.**

On September 16, 2005, I, **Simon A. Lundy,** was coerced and threatened by
two Government Attorneys. **Thomas Reinhard Iben** and **Robert Andre Alvarado.**

Attorney Iben said that if I take my case to trial, that following Monday,
September 19, 2005, he would represent my case being angry at me, and he would
tell the jury that I sold drugs to the Government Informer **Diondre L. Wakefield.**

Attorney Iben, also pulled a plea-contract from his briefcase, rolled
it up and threw it at me, hitting me in the face, sending the contract disbursing
all over the floor.

8.

Attorney Alvarado was terminated from my case over a year prior to allegedly being invited to persuade em to plead guilty, September 16, 2005.

Attorney Alvarado said the government would offer me a get-out-of-jail-free pas if I were to plead guilty to one of the two indictment counts.

Attorney Alvarado said the government had a curtain interest in a case that my codefendant **Diondre L. Wakefield** would be testifying in.

Attorney Alvarado said my codefendant **Diondre L. Wakefield** was testifying for the Government against **Timothy Bailey.**

Attorney Alvarado said he and Attorney Iben both were representing, for the Government, several witnesses each, against **Timothy Bailey.**

On May 12, 2006, Attorney Alvarado and Iben testified under oath to these allegations during the proceedings of my plea-withdraw hearing.

---

In mid 2003, **Ricky A. Hurt** was assassinated in the streets of Peoria, IL. After his death, the Assistant U.S. Attorneys shifted the weight of his investigation onto the cases of **Timothy Bailey** and his brother **Shane Williams.**

The Government made a vague attempt to force **Timothy Bailey** and his brother **Shane Williams** to cooperate in their investigations against **Sylvester Mickle** and **Marvell Thompson.**

---

Immediately after my case was coerced, threatened, and forced into a guilty plea, my codefendant **Diondre L. Wakefield** testified at the trial of **Timothy Bailey.**

In mid 2006, an article in the Journal Star Newspaper of Peoria, Illinois indicates that, Government Informers from the cases of **Timothy Bailey** and his brother **Shane Williams** were testifying in the courtroom of District Judge **Joe Billy McDade,** to allegations of themselves being offered bribes of sentence reductions by Assistant U.S. Attorneys **K. Tate Chambers** and **Bradley Murphy,** in exchange for perjured testimony against the brothers.

---

## "CONSPIRED CONVICTION AND SENTENCE"
### STATEMENT OF FACTS

**Background:**
**SIMON ANDRE LUNDY:**

9.

Indicted June of 2003 on two counts to conspire to distribute a Schedule
II controlled substance. 50 grams or more of crack cocaine base and 5 kilograms
or more of powder cocaine.

Arrested December 2003. Bonded December 2003.

Arraignment January 2004. Not Guilty.

Bond Revoked September 2004.

Entered Guilty Plea September 2005 to one of two counts.

Plea-withdraw Hearing May 2006. Denied.

Sentenced June 2006 to 188 months.

Direct Appeal, argued February 2007. Affirmed May 2007.

---

## TO WHOM IT MAY CONCERN

It's clear that I, **Simon A. Lundy,** was forced into this conviction and
188 month prison sentence. Simply because I refused to cooperate with the
Government Officials in the Central District of Illinois, Peoria. Moya v.
U.S.A., 761 F.2d 322 (7th Cir. 1985).

To prove charges of Prosecutorial Misconduct without the proper resources
or financial contributions is impossible. This is why I plead my case "To
Whom It May Concern."

The Central District of Illinois, Peoria's Government Officials indeed,
conspired against my case, for cases they shared compelled adverse interests
in. Also, the assassination of would have been indicted gang, druglord and
murderer **Ricky A. Hurt.**

I have never met Mr. Hurt. My codefendant **Diondre L. Wakefield,** is the
link to these Government cases of compelled adverse interest. These cases
of adverse interest are linked to several murders, assault weapons, drugs and
gangs. However, I shall not be made into a scapegoat because of these cases
of compelled adverse interest by the prosecutors.

The bulk of this complaint, is a matter of Government information from
the files of the Federal Bureau of Investigation (F.B.I.) and District Court
Transcripts.

As you can see, my case is anything other than an ordinary drug case between
my codefendant and myself. A tell tell sign of how desperate the Government
wanted my case to not proceed to trial at the eleventh hour. The Government
stood in court, at my "Change of Plea Hearing," and testified that their main

10.

informer, my codefendant **Diondre L. Wakefield**, <u>was not</u> the best evidence as to drug charges against me. Instead, their best evidence came from a complete stranger who formed a jailhouse relationship with me three years after Wakefield was arrested and two years after I was indicted. Later, the eleventh hour <u>concession</u> turned out to be worthless at sentencing. Another scam by the prosecutors to obtain a guilty plea for the Government cases of compelled adverse interest.

Another tell tell sign, six (6) Government-appointed attorneys, to only have the lead investigator Special Agent from the Drug Enforcement Administration (DEA) agent **Paul Larsen**, testify that his evidence was very weak, and could only be judged by preponderance.

---

**Background:**

**DIONDRE L. WAKEFIELD:**

Arrested October 2002.

Pled Guilty June 2003.

Sentenced to 21 years, 5 years supervised release.

Criminal History:  Arson, assault with deadly weapon, rape, counterfeit, extortion, bribery, numerous drug convictions.

Mental Health:  Inpatient/outpatient several Mental Health Institutions.

---

It should be noted that prosecutors **K. Tate Chambers** and **Bradley Murphy**, were aware that Wakefield testified with perjury testimony during my sentencing hearing, when he testified that I was his only drug supplier from early 2002, until his arrest in October of 2002. Wakefield testified before my sentencing hearing that **Timothy Bailey** and others were his drug supplier during the same time frame. **AUSA Chambers** prosecuted the **Timothy Bailey** case.

As it is reported in the proffer information provided to AUSA Chambers, by Government informer **Michael D. Williams**, the Government should have arrested **Ricky A. Hurt** a long time before his assassination was executed.

Instead, the Government did not apprehend Mr. Hurt in order to further their investigations of compelled adverse interests cases.

Below is an incomplete list of victims who were murdered "Directly or Indirectly" by the following: **Marvell Thompson, Sylvester Mickle, John Tyrone Williams, Michael D. Williams** and **Ricky A. Hurt.**

11.

MURDERED VICTIMS

**TERELL WALKER**
**KEVIN I. MICKLE**
**ANTONIO L. STUCKEY**
**GREGORY N. MINNIX**
**JASON A. BENNETT**
**CLARENCE PETERSON**
**JERRY WILLIAMS**
**TERRENCE TURNTINE**
**and ultimately RICKY A. HURT.**

---

Another tell tell sign: The infamous and legendary defense attorney **Ronald Hamm,** quoted in one of his letters addressed to me, Attorney Alvarado is one of the greatest attorneys in the State of Illinois and he (Hamm) did not believe that Attorney Alvarado would have advised the prevention of my case from proceeding to trial.

With such a high recommendation as this, it doesn't seem likely that Attorney Alvarado would violate a court order, and cross jurisdiction in a vague attempt, to rescue me from a guilty verdict or a lengthy prison sentence.

It would seem more likely that Attorney Alvarado violated the court order to expedite my case from proceeding to trial in the eleventh hour. Also, Alvarado testified that when he was my legal attorney, he was in full knowledge of my codefendant **Diondre L. Wakefield** and himself sharing a common cause in the Government's case against **Timothy Bailey.**

---

Nevertheless, Attorney Alvarado's advice to me in the eleventh hour, before trial, became crucial in my final hour, before making a rational decision to not proceed to trial. My rational decision manifested, in the final hour of an unknown, premature, prescheduled "Change of Plea Hearing," scheduled a day prior to the advice of Attorney Alvarado, advising me to not proceed to trial.

There are only two (2) District Judges in the Central District of Illinois. Judge Joe B. McDade and Judge Michael M. Mihm.

Therefore, they divide all federal cases amongst themselves. My codefendant, Government informer **Diondre L. Wakefield,** has either, signed a Rule 35 (b) or testified on at least one third of the drug cases since his arrest, October

12.

22, 2002.

**Diondre L. Wakefield,** testified under oath to my knowledge in the courtroom of District Judge Michael M. Mihms, that I, **Simon Lundy,** was his only drug supplier before his arrest in the year 2002.

Even in August of this year 2007, attorneys for the Government will be representing one of their cases of compelled adverse interest, and **Diondre L. Wakefield,** will be testifying against that pretrial detainee as well.

As I write as a friend of the court, I strongly encourage the presiding judge to bar this particular informer's testimony from future trial proceedings represented by Assistant U.S. Attorneys **K. Tate Chambers** and **Bradley Murphy,** and Drug Enforcement Administration (DEA) Special Agent **Paul Larsen.**

Finally, my case was forced to avoid trial, simply, that it would not doom the credibility of the arresting case of my codefendant Government informer **Diondre L. Wakefield's** Rule 35 (b), or testimony of future cases the Government had had compelled adverse interests in.

This blind injustice by the Government Officials within the Central District of Illinois, Peoria, need be investigated in its totality. The Government has illegally violated the plea contract. Title 18 U.S.C. § 4, Misprison of Felony. With a contract law titled "Bait and Switch."

In the eleventh hour before trial, the Government stood in the District Courtroom of Judge Michael M. Mihm's and stated that they would be willing to honor a concession at my sentencing hearing.

At my sentencing hearing, the concession was never honored. Instead, the Government switched and readjusted the proffer statements of two out of the three informers.

I was told as a selling point, in the eleventh hour before trial, that I would be given the opportunity to argue at sentencing, the Government's best evidence as to drug weight in reference to the concession.

Before the concession was offered, the Government implemented two of their three informers **Diondre L. Wakefield** and **Paul Reed,** with proffer letters that indicated drugs.

The Government's third informer, **Kennth Zimmerman's** proffer letter only indicated "Threats."

The concession was baited with the drug weight of **Paul Reed's** proffer letter, 13 ounces of cocaine, and a chance to argue drug type at sentencing. Being that **Paul Reed's** proffer letter never mentioned 'Crack Base!'

13.

At the sentencing hearing, the Government declined to call the concession informer **Paul Reed** to testify. Instead, the Government switched **Paul Reed's** proffer letter to the testimony of **Kennth Zimmerman**, and included the drug weight and type. (Kilograms of both 'Crack & Powder Cocaine.')

My codefendant Government informer **Diondre L. Wakefield**, testified at sentencing, that he had never purchased crack base cocaine from me. He testified he was fronted only 13 ounces of 'Crack Base Cocaine,' allegedly from me.

The Government, has painted a picture, that in the eleventh hour before trial, they pitched me a selling point, where as, I was sold on the promised concession, that **Kennth Zimmerman** would testify at my sentencing hearing to drug weights and types, indifference to the weights of my codefendant and their main informer **Diondre L. Wakefield.**

It seems more likely that **Paul Reed's** 13 ounces of cocaine, without the mentioning of "Crack Base," would have been a more appropriate argument than **Kennth Zimmerman's** "Kilograms of Crack Base Cocaine."

The government baited the concession with **Paul Reed's** 13 ounces of cocaine and switched with **Kennth Zimmerman's** Kilograms of Crack Base Cocaine.

I have also filed a "Mandamus" against Assistant United States Attorney Kendall Tate Chambers in the District Court. Presiding Judge Joe Billy McDade, 100 N.E. Monroe St., Peoria, Illinois 61602.

---

The only information in this complaint that is "Frivolous & Malicious" is the actions of Assistant United States Attorneys **K. Tate Chambers** and **Bradley Murphy,** and the assistance of Special Agent for the Drug Enforcement Administration, agent **Paul Larsen.**

I, **Simon A. Lundy,** believes that I have established merit and a fair and just cause to have Assistant U.S. Attorney Kendall Tate Chambers investigated for the causes of **"PROSECUTORIAL MISCONDUCT."**

Executed on this 23rd day of May, 2007.

Respectfully Submitted,

Simon A. Lundy

Simon A. Lundy

14.

*** LIMITED OFFICIAL USE ***

DATE: 08/03/2006 TIME: 12:43  PAGE:    2

UNITED STATES MARSHALS SERVICE
PRISONER TRACKING SYSTEM
CENTRAL ILLINOIS
DISTRICT: 26   OFFICE: PIA

INDIVIDUAL CUSTODY AND DETENTION REPORT USM (129)

NAME:    LUNDY, SIMON ANDRE
USMS NUMBER: 16585424

2    **********                                        **********

III. STATUS HISTORY

| CTR | STATUS | STATUS DATE | CUSTODY DATE | RELEASE DATE | REMARK |
|-----|--------|-------------|--------------|--------------|--------|
| 1 | IN-ADMIN | 01/20/2004 | 01/20/2004 | ********** | WOR FROM CHICAGO |
| 1 | RL-BOND | 01/20/2004 | ********** | 01/20/2004 | |
| 1 | READMIT | 09/23/2004 | 09/23/2004 | ********** | VIOL OF COND |
| 1 | WT-TRIAL | 09/23/2004 | ********** | ********** | |
| 1 | WT-SENT | 09/19/2005 | ********** | ********** | PLED GUILTY;SENT 6/15/06 |
| 1 | WT-DESIG | 07/11/2006 | ********** | ********** | |
| 1 | WT-MOVE | 07/18/2006 | ********** | ********** | DESIG TO FCI-SST |
| 1 | RL-BOP | 08/02/2006 | ********** | 08/02/2006 | A/L BUS FFT |
| 2 | WT-TRIAL | 09/23/2004 | 09/23/2004 | ********** | |
| 2 | WT-SENT | 09/16/2005 | ********** | ********** | |
| 2 | RL-DISMSS | 06/15/2006 | ********** | 06/15/2006 | |

*Change of Plea Hearing*
*Pre-Scheduled 9-15-05*
*For 9-16-05*
*(See Court Docket Report).*

IV. CHRONOLOGICAL PRISONER HISTORY

| INST CODE | INSTITUTION NAME | ADMIT DATE | RELEASE DATE | DAYS BOARDED | ACTION OR DISPOSITION |
|-----------|------------------|------------|--------------|--------------|-----------------------|
| BND | ON BOND | 01/20/2004 | 09/23/2004 | 1 | |
| 5DF | KNOX CO JAIL | 09/23/2004 | 08/02/2006 | 678 | |

TOTAL DAYS BOARDED    679

THIS INFORMATION IS THE PROPERTY OF THE U.S. MARSHALS SERVICE AND SHALL NOT
BE PUBLICLY RELEASED OR DISSEMINATED WITHOUT U.S. MARSHALS SERVICE AUTHORITY.

****** END OF REPORT ******

Mr. Simon A. Lundy, Sr.
Reg. No. 16585-424-C
Federal Correctional Institution
P.O. BOX 1000
Sandstone, MN 55072

**FILED**

APR 1 3 2007

April 9, 2007

JOHN M. WATERS, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOI

Honorable Michael M. Mihm
District Courthouse
100 N.E. Monroe Street
Peoria, Illinois 61602

Dear Judge Mihm,

I am in pursuant of the correct information pertaining to why was I ordered to
the District Courthouse, Friday, September 16, 2005.

My presiding counsel Phillip J. Kavanaugh, has indicated in a prior letter
dated October 13, 2006, that he traveled to Peoria, Illinois to investigate my
claims on this matter and others. He writes, that the Judge's administrative
assistant ordered me in for the purpose of exploring a plea on September 15, 2005.

He stated in his letter, that he wasn't able to learn the source of the
request.

I have previously, on many occasions written to your administrative assistant
attempting to retrieved the source who requested the order, to no prevail. However
my docket report claims that I was brought to the District Courthouse on Friday,
September 16, 2005, for a " Change of Plea Hearing," not for the purposes of explo
ring plea-agreements.

### CONCLUSION

Your Honor, I'm respectfully requesting as a matter of record, the source[s] who
requested that your administrative assistant place the order for the date of
September 15, 2005, I, SIMON A. LUNDY, to appear in Courtroom C at 4:30 PM.

Thank you for your time and consideration, and may I please have a response at
your earliest convenience.

Respectfully submitted,

Simon A. Lundy
SIMON A. LUNDY

MIME-Version:1.0
From:ECF_Returns
To:ECF_Notices
Bcc:ILCPml_Filings@ilcp.uscourts.gov, Kim.Sanders@usdoj.gov, Greg.Sims2@usdoj.gov,
Daryl.Hollenback@usdoj.gov, Glen.Williams@usdoj.gov, Chambers.Mihm@ilcd.uscourts.gov,
brad.murphy@usdoj.gov, kimberly.ritthaler@usdoj.gov, margo.l.scamp@usdoj.gov
Message-Id:<502148>
Subject:Activity in Case 1:03-cr-10064-MMM USA v. Lundy Order on Motion for Miscellaneous
Relief
Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid
later charges, download a copy of each document during this first viewing.**

## U.S. District Court

### United States District Court for the Central District of Illinois

## Notice of Electronic Filing

The following transaction was entered on 4/18/2007 at 8:49 AM CDT and filed on 4/18/2007
**Case Name:**          USA v. Lundy
**Case Number:**      1:03-cr-10064
**Filer:**
**Document Number:** No document attached

**Docket Text:**
Text ORDER finding as moot [161] Motion for miscellaneous relief as to Simon Lundy (1). In response to Defendants
inquiry as to why he was brought to the Courthouse on 9/16/05 the court states that the defendant was transported at the
request of Defendants attorney at the time to facsilitate communications regarding a possible plea. Entered by Judge
Michael M. Mihm on 4/18/07. (c: All Counsel/Defendant Lundy) (MMM0, ilcd)

**1:03-cr-10064-1 Notice has been electronically mailed to:**

K Tate Chambers      kimberly.ritthaler@usdoj.gov, margo.l.scamp@usdoj.gov

Bradley W Murphy      brad.murphy@usdoj.gov, kimberly.ritthaler@usdoj.gov, margo.l.scamp@usdoj.gov

**1:03-cr-10064-1 Notice has been delivered by other means to:**

Phillip J Kavanaugh
FEDERAL PUBLIC DEFENDER
650 Missouri Avenue
Room G10A
East St Louis, IL 62201

Mr. Simon A. Lundy
Case No. 03-10064
Reg. No. 16585-424-C
Federal Correctional Institution
P.O. BOX 1000
Sandstone, MN 55072

Judge Michael M. Mihm
District Court Building
100 N.E. Monroe Street
Peoria, Illinois 61602

April 25, 2007

Dear Judge Mihm,

The prompt response from a recent letter I sent dated April 9, 2007, respectfully requesting information concerning the scheduling of my court appearances is greatly appreciated.

However, the main question I was inquiring about was never answered. I was inquiring about information concerning the person who requested your administrative assistant to schedule one of the most important events of a criminal trial procedure. ( The Change of Plea Hearing ).

In your response to my letter, the "text order" indicates that my then attorney Thomas R. Iben, requested that I be brought to the courthouse to facsilitate communication regarding a possible plea, on the date of 9/16/05.

I am respectfully requesting the name of the person[s] who requested a court order, for my appearance to appear at the ( Change of Plea Hearing ) scheduled for the date of September 16, 2005, in Courtroom 'C' at 4:30 PM.

Respectfully submitted,

_____

SIMON LUNDY
Defendant.

```
MIME-Version:1.0
From:ECF_Returns
To:ECF_Notices
Bcc:ILCPml_Filings@ilcp.uscourts.gov, Kim.Sanders@usdoj.gov, Greg.Sims2@usdoj.gov,
Daryl.Hollenback@usdoj.gov, Glen.Williams@usdoj.gov,
Chambers.Mihm@ilcd.uscourts.gov, brad.murphy@usdoj.gov,
kimberly.ritthaler@usdoj.gov, margo.l.scamp@usdoj.gov
Message-Id:<509743>
Subject:Activity in Case 1:03-cr-10064-MMM USA v. Lundy Order
Content-Type: text/html
```

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### United States District Court for the Central District of Illinois

## Notice of Electronic Filing

The following transaction was entered on 5/1/2007 at 9:00 AM CDT and filed on 5/1/2007
**Case Name:**      USA v. Lundy
**Case Number:**    1:03-cr-10064
**Filer:**
**Document Number:** No document attached

**Docket Text:**
Text ORDER as to Simon Lundy re [162] Letter. The court is in receipt of a letter from the Defendant dated April 25, 2007. The court sees no further reason to respond to these inquiries from the defendant as it feels these matters have been fully responded to previously. Since the Defendant is represented by counsel any further inruiries into the hearing on 9/16/2005 or other matters should come from Defendants appointed counsel. Entered by Judge Michael M. Mihm on 5/1/07. (MMM0, ilcd)

**1:03-cr-10064-1 Notice has been electronically mailed to:**

K Tate Chambers    kimberly.ritthaler@usdoj.gov, margo.l.scamp@usdoj.gov

Bradley W Murphy    brad.murphy@usdoj.gov, kimberly.ritthaler@usdoj.gov,
margo.l.scamp@usdoj.gov

**1:03-cr-10064-1 Notice has been delivered by other means to:**

Phillip J Kavanaugh
FEDERAL PUBLIC DEFENDER
650 Missouri Avenue
Room G10A
East St Louis, IL 62201

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
OFFICE OF THE CLERK
ROOM 309
FEDERAL BUILDING
100 N.E. MONROE
PEORIA, ILLINOIS 61602

**OFFICIAL BUSINESS**

5507281000 B008



**Hasler**

016H6502140
**$ 00.390**
05/01/2007
Mailed From 61602
**US POSTAGE**

Simon Lurdy 16585-424-C
Federal Correctional Institution
PO Box 1000
Sandstone, MN 55072

Mr. Simon A. Lundy, Sr.
Reg. No. 16585-424-C
Federal Correctional Institution
FCI, Sandstone
P.O. Box 1000
Sandstone, MN 55072
Federal Case No. 03-10064-001

Prepared For: The District Court Building
100 N.E. Monroe Street
Peoria, Illinois 61602


May 23, 2007


### DECLARATION OF INTENTIONS

In my formal statement, I will specifically point out the facts and circumstances of the government causing the District Judge to sentence me to 10 years over my actual guilt.

In my formal statement, I will point out the facts and how the government protected a major informer's credibility.

In my formal statement, I will point out the circumstances and how the government appointed this particular informer to major drug cases.

In my formal statement I will point out the facts and circumstances how the government manipulated, threatened, forced and coerced my case from proceeding to trial.

As I sit in this federal correctional institution, I sit distressful and distrustful with our government. But yet I still have a sense of pride in our "Declaration of Independence" and values in our Constitutional laws that govern the United States of America.

1.

On October 22, 2002, my codefendant and major government informer, Diondre L. Wakefield, was arrested and upon a search of his residence warranted approximately 13 ounces of "crack cocaine" and 13 ounces of "powder cocaine."

The following day after his arrest, he cooperated with the government in placing a recorded phone conversation to his alleged drug supplier. The phone conversation was meant to be an entrapping conversation about drug transactions between the informer and his supplier. But the government was not satisfied with the details of the conversation. Therefore, the government requested that the informer place a second call with more specific details about drug transactions between the informer and his alleged drug supplier.

The informer declined to make a second recorded phone conversation to his alleged drug supplier. He stated that the alleged supplier may have been warned by people on the outside, that he was incarcerated.

The fact is the informer warned the alleged drug supplier that he was incarcerated immediately after the first and only recorded phone conversation. The informer made contact with the alleged drug supplier and instigated a "Blackmailing scam" that netted the informer approximately $1,000.00 in currency transactions thru Western Union Services.

The government informer threatened the alleged drug supplier that if he discontinued the money flow thru Western Union Services, that he would say to the Grand Jury "Crack Cocaine" was fronted to him and several kilograms of "Powder Cocaine" was purchased by him from the alleged drug supplier. With that threat, the alleged drug supplier discontinued the money flow.

Approximately six months after the government's informer was arrested, I, Simon A. Lundy was indicted by a Grand Jury and charged with conspiracy to distribute over 50 grams of "Crack Base Cocaine" and 5 kilograms or more of "Powder Cocaine," to the government informer Diondre L. Wakefield.

Approximately six months after I was indicted, I was arrested, and posted bond. Approximately six months after posting bond, my bond was revoked for failing drug screens. I was ordered to be held incarcerated in the Knox County Jail, Galesburg, IL, as a Pre-Trial Detainee.

For reasons unbeknown to me, I was ordered to be incarcerated within the same jailhouse as my co-conspirator, government informer Diondre L. Wakefield, from September 23, 2004, until December 1, 2004.

2.

Within a few days upon my arrival, the government informer directed a trustee by the name of Mr. Hall to relay a message of blackmail threats to me in the sum of $50,000.00 that he would not testify against me at trial. I declined his threat of blackmail with a threat of my own. And immediately reported this incident to my attorney, Arthur Inman.

Approximately two weeks later, a Deputy Sheriff Officer by the name of Stuward Inman from the Knox County Sheriff Department approached me with information that the government informer, Diondre L. Wakefield, threatened that if the officer would not allow him to resume his duties as a trustee, that he would call the government and threaten to not testify at my trial. I immediately reported that information to my attorney, Arthur Inman.

Attorney Arthur Inman was my second government appointed attorney out of six. My first appointed attorney, Federal Public Defender Robert Andre Alvarado, was comfortable with my case proceeding to trial. After six months of his representation, he was terminated by the government within a week before trial. The government's excuse for terminating attorney Alvarado was for reasons that Attorney Alvarado shared a working relationship within the same office as a co-worker who represented the government informer on an unrelated case.

Once attorney Arthur Inman was appointed to my case, he immediately was against proceeding to trial with my case. Attorney Arthur Inman, insisted that if I proceeded to trial, that a jury will find me to be 50% guilty based on my race and where I lived alone.

Attorney Arthur Inman, refused to act on or against the information I provided to him concerning the "blackmail threats," and the attempted "bribery threats" from the government informer.

After attorney Arthur Inman allowed the government to file a blind continuous, without justification, I petitioned for his termination. Although the judge terminated attorney Arthur Inman, the judge threatened that if I don't bow down to the next attorney he appoints to my case, that he was not going to appoint another and that I would end up dissatisfied.

At the petition hearing to terminate attorney Arthur Inman, Mr. Inman testified that he was holding those two charges against the government informer in his hip pocket! And somehow was going to produce them at trial without the benefit of an investigation to prove merit to the complaints.

3.

The government testified at Mr. Inman's hearing that they had learned for the first time after five months that their main informer and I spent approximately three months in the same facility.

Despite many letters to the AUSA K. Tate Chambers to action these charges against the government informer Diondre L. Wakefield, attorney Chambers declined my requests. Afterwards, I felt it necessary to file a "Mandamus" with the District Court against Assistant U.S. Attorney K. Tate Chambers simply refused to tarnish the credibility of their major informer Diondre L. Wakefield for the sake of the government's up and coming cases of compelled adverse interest.

The government informer Diondre L. Wakefield's signature is stamped on every major drug case since 2001 that has ever been prosecuted in the Central District of Illinois, Peoria, with Assistant U.S. Attorneys K. Tate Chambers and Bradley Murphy.

It is a well known fact that Assistant U.S. Attorney K. Tate Chambers position the major informer onto any case he deems fit. It is also a documented fact that attorney Chambers was suspended for approximately two weeks for tampering with witnesses, at least two witnesses have pointed him out in open court as the prosecutor who offered them sentence reductions in exchange for perjured testimony.

From the time of my arrest in December, 2003, until the day of my coerced plea agreement, the government and the government-appointed attorneys threatened me with a life sentence or a minimum of 20 years if I went to trial and was found guilty as 98% of all federal defendants are. In the battling with the government from December, 2003 thru September, 2005, I have written to several Senators, Congressmen, Judges, Government Agencies and even the President of the United States. I wrote in a vague attempt to stop the government from derailing my case off the tracks to trial.

I single-handedly fought the government and the government-appointed attorneys up until the eleventh hour before my final trial date. Which was scheduled for Monday, September 19, 2005. That Friday, September 16, 2005, the weekend before my final trial date, I was railroaded, threatened, conspiratorially manipulated, coerced and forced to not proceed to trial over the weekend.

1. A government official prematurely scheduled a "Change of Plea" hearing for me 24 hours in advance of my being railroaded to change my plea.

4.

2.   I was forced to sit in a deserted cell block for over eight hours, waiting for this prearranged change of plea hearing.

3.   My attorney Thomas R. Iben testified that he did not arrange for me to be brought to the court holding cell on September 16, 2005, for a prematurely scheduled "Change of Plea Hearing" that was scheduled 24 hours prior to me being railroaded to change my plea.

4.   The District Judge Michael M. Mihm implicated to me in his text order that my attorney Thomas R. Iben had me brought over to the Court on September 16, 2005, to discuss plea agreements, not to participate in a "Change of Plea Hearing" that was prematurely scheduled 24 hours before I was railroaded to change my plea.

5.   It's clear that whomever ordered this premature "Change of Plea Hearing," conspired for me to change my plea 24 hours before I was railroaded to change my plea.

6.   On the day my case was railroaded from proceeding to trial, the government used my former attorney, Federal Public Defender Robert A. Alvarado, to manipulate the rapport we shared, in their advantage to persuade me from proceeding to trial over the weekend.

7.   Attorney Alvarado testified that he violated a court order and crossed jurisdiction to rescue me from proceeding to trial and facing a guilty verdict.

8.   Attorney Alvarado also testified that he and the government's major informer Diondre L. Wakefield was working with the government on a government case of compelled adverse interest (The Timothy Bailey case).

9.   On the day my case was railroaded from proceeding to trial, my then attorney Thomas Iben, later testified that he threw a stack of papers at me and said that if I continue my case to a trial, that at my trial he would be mad at me and tell the jurors that I had in fact sold drugs to the government informer Diondre L. Wakefield.

10.   The government and my attorney Thomas R. Iben were running out of time on the day my case was railroaded from proceeding to trial.  In the final hour, before the premature "Change of Plea Hearing" scheduled for 4:30 PM in courtroom "C" on September 16, 2005, the government and my attorney introduced to me and the court, their final act of manipulation: A worthless concession.

11.   My attorney, Thomas Iben, explained to me that if I would be willing to confess to the judge my actual involvement in this crime, which was the

5.

same involvement that I have confessed to each of my attorneys from day one, which was two drug sales both totaling 13 ounces of "powder cocaine" to the government informer Diondre L. Wakefield, on two different occasions, that the government would tell the judge that their best evidence as to drug weights and types did not come from the main informer Diondre L. Wakefield, but rather from a new informer of the government named Paul Reed who provided the government with a proffer statement against me, alleging that I made a statement to him that I sold the government informer Diondre L. Wakefield 13 ounces of cocaine, no particular type.

12.   The government perpetrated the concession as giving me the opportunity to finally confess to my actual guilt of 13 ounces of cocaine, versus the "Blackmailing Relevant Conduct" of my co-conspirator Diondre L. Wakefield's testimony to the Grand Jury, something I've been fighting to avoid since I declined his money flow from the "Blackmailing threats of going to testify to a Grand Jury with fabricated conspiracy factor of "Crack and Powder Cocaine."

18.   At 4:30 PM, Friday, September 16, 2005, after a long drawn out battle, I gave in to the opportunity to finally tell my side of the story and confess to my involvement in this crime.   I said everything and agreed to my acceptance of responsibility for my actions.

19.   At my sentencing hearing, the government reneged on their concession.   Although Paul Reed was in the courthouse on that day, the government never called him to the stand to testify that I allegedly made a statement to him that I sold 13 ounces of cocaine to their informer Wakefield as was promised in the concession to railroad me from proceeding to trial. Instead, the government switched the concession informer Paul Reed's proffer statement onto the third informer's testimony and implemented in his testimony that I allegedly made a statement to him that I sold the government's main informer, Diondre L. Wakefield, kilograms of both "Crack and Powder Cocaine."

20.   Although the third informer, Kennth Zimmerman, never before my sentencing date made any references in his proffer statement or pre-sentence report, the District Judge accepted his testimony as collaborating sorts in comparison with the government's major informer Diondre L. Wakefield, who ironically testified before Kennth Zimmerman during the sentencing hearing to never being sold "crack cocaine," but that he was fronted only 13 ounces of "crack cocaine," on consignment.

6.

21.   The government bait and switched concession inspired the judge to accept the credibility of their main informer Diondre L. Wakefield's relevant conduct.

22.   Instead of the 13 ounces of powder cocaine I plead guilty to, the judge convicted me of being responsible for 13 ounces of crack cocaine and 8 kilograms of powder cocaine. Which enhanced my sentencing guideline level from 21 to level 34 without the acceptance of responsibility reduction.

23.   Kennth Zimmerman testified at my sentencing hearing, that he was testifying against me without the possibility of receiving a sentence reduction from his life sentence. Zimmerman also testified in his proffer letter that before he introduced himself to me in the Knox County Jail, that he and the government's main informer were sharing the same living quarters in the Terre Haute Federal Correctional Institution. Zimmerman also testified in his proffer that after he befriended me, I directed him to upon his return to Terre Haute Institution, for him to warn gangbangers that government informer Diondre L. Wakefield was a snitch for the government against my case. Zimmerman also testified in his proffer letter that I provided him with a prison I.D. number.

24.   Kennth Zimmerman provided false testimony to his Rule 35(b) when he falsely accused me of providing him with a prison I.D. number because the true nature of the fact is that when Kennth Zimmerman introduced himself to me, I had never been in prison before, therefore, he never could produce a prison I.D. number under cross examination by my attorney during my sentencing hearing.

It is my opinion that Zimmerman was confronted with this false prison I.D. number statement in his proffer letter by the D.E.A. agent on my case, Paul Larsen.

It is my opinion that agent Paul Larsen suggested to Zimmerman that he testify at my sentencing hearing with additional information from his original proffer letter, or else Zimmerman run the risk of losing his already rewarded sentence reductions from his life sentence to 19 years. In violation to his Rule 35(b). This is why Kennth Zimmerman testified that for his testimony he was testifying without the possibility of a sentence reduction for his cooperation in favor of his Rule 35(b). The false prison I.D. forced Zimmerman to testify to additional information about kilograms of both crack cocaine and powder cocaine.

7.

My case was not a government case of compelled adverse interest. My co-conspirator, government major informer Diondre L. Wakefield's arresting case, was very important to the government, not to destroy his credibility on his Rule 35(b) in order that the government can continue with his presence on their future cases of compelled adverse interest, in which he is present on each major drug case represented by K. Tate Chambers and Bradley Murphy from the U.S. Attorney's Office in the Central District of Illinois, Peoria.

What I can't understand is how is the same two prosecutors, Chambers and Murphy, still using my co-conspirator, Diondre L. Wakefield, on all their major drug cases of compelled adverse interest when Wakefield testified under oath that I, Simon A. Lundy, was his sole drug supplier.

In August of this year, 2007, the same two prosecutors, K. Tate Chambers and Bradley Murphy, will be once again representing Diondre L. Wakefield on yet another major government drug case of compelled adverse interest, which makes me wonder how many murders were committed during the investigation of this major drug case.

Ironically, K. Tate Chambers, is the prosecutor who sentenced the government's major informer, Diondre L. Wakefield, to 21 years and five years supervised release.

Ironically, K. Tate Chambers is the same prosecutor who sentenced Kennth Zimmerman to life in prison.

Ironically, K. Tate Chambers has represented both Wakefield and Zimmerman on dozens of major government drug cases.

After Wakefield's final testimony in August of 2007 on this major drug case represented by K. Tate Chambers, his 21 year prison sentence will be reduced to 5 years, and he has perjured himself on each case, including his arresting case, which I was railroaded from going to trial to cover up his perjury.

Kennth Zimmerman received his final Rule 35(b) reduction, before my sentencing hearing June of 2006. His life sentence was reduced to 19 years. That's the motive why he testified at my sentencing, not because he was an honest American citizen.

If Assistant United States Attorney Kendall Tate Chambers was willing to leave a potential government witness, Ricky A. Hurt, on the streets to further the government's investigations into the cases of Sylvester Mickle and Marvell

8.

Thompson, people who Attorney Chambers had full knowledge, were plotting to assassinate Ricky A. Hurt, and were suspects either directly or indirectly involved in several other murders, then certainly railroading my case from proceeding to trial was a cinch.

Ironically, after three years of K. Tate Chambers investigating Sylvester Mickle and Marvell Thompson, Ricky A. Hurt was assassinated in the streets of Peoria, IL within the week of his indictment warrant was to be executed.

Assistant United States Attorney K. Tate Chambers should bare some responsibility for Ricky A. Hurt being assassinated while under the protection of the city of Peoria's ordinance law.

In my opinion, once Attorney Chambers was provided undisclosed information from the evidence of murdered victim Terell Walker (Guns and Ski Masks) back in 2002, this information was provided to Attorney Chambers by confidential informer Michael D. Williams, who also stated that Ricky Hurt was one of the two triggermen who killed Terell Walker. Ricky Hurt should have been arrested a long time prior to his assassination but Chambers allowed him to stay on the streets to further the government's cases of compelled adverse interest. It never mattered to K. Tate Chambers how many young African Americans were being murdered. The only thing that mattered to K. Tate Chambers was prosecuting and convicting government cases of compelled adverse interest.

In my "Declaration of Intentions," I believe that I, Simon Andre Lundy, has established clear facts and circumstances that Assistant United States Attorney Kendall Tate Chambers has proven himself to be "Guilty" of conspiring against my case for his personal interest in prosecuting and convicting government cases of compelled adverse interest.

I, Simon A. Lundy, am respectfully requesting, under Title 201(d) from the Constitutional laws that govern this statute, that my "Declaration of Intentions" be heard in a court of law to determine "Merit" and "Misconduct Violating Due Process," United States v. Mangieri, 224 U.S. App. D.C. 295, 298, 694 F.2d 1270, 1273 (1982) [Citation omitted]. Federov v. United States, 600 A.2d 370 (D.C. 1991). Jacob Zedner v. United States, 547 U.S. --, 126 S. Ct. --, 164 L. Ed. 2d 749 [No. 05-5992] Argued April 18, 2006. Decided June 5, 2006.

I, Simon A. Lundy, hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date: June 21, 2007          Signed: Simon A. Lundy
                                     Simon A. Lundy

9.

# POLICE, FIRE AND COURTS

Marnette Allen's bond was reduced Thursday from $75,000 to $25,000.

Her next court appearance was scheduled for Sept. 5.

Frazier, charged with aggravated reckless driving, is scheduled to appear in court June 28.

## Boy reported missing is now in DCFS custody

**LONDON MILLS** — Several police and fire departments and the Fulton County ESDA responded Thursday when a London Mills woman reported her 3-year-old son was missing.

The boy was found safe later Thursday in a machine shed at his home at 3591 N. Coal Creek Road.

The same boy was found walking alone along a highway last week, and his mother was arrested Thursday on charges of child endangerment, according to the Sheriff's Department.

Cassandra M. LeRoy, 39, was given a notice to appear July 27 in Fulton County court.

LeRoy told police her son was asleep when she checked on him at 6 a.m. Thursday. She said she woke up at 11:15 a.m. and he was gone. She called police at 11:20 a.m.

Members of the Sheriff's Department, Illinois State Police, the London Mills and Fairview fire departments and the Fulton County Emergency Services and Disaster Agency looked for the boy.

At about 9:40 a.m. June 7, a motorist found the boy walking in a ditch on Illinois Route 116 and Shortnett Road, the Sheriff's Department said.

After the June 7 and Thursday incidents, police put the boy in the custody of the Department of Family and Children Services.

## Men sent to prison for marijuana offenses

**CAMBRIDGE** — Two Rockford men were sentenced to prison Tuesday for possessing 3,600 pounds of marijuana.

Felipe Guzman, 41, was sentenced to 20 years in prison and Pablo Garcia, 37, was sentenced to 18 years through a negotiated plea agreement in Henry County Court.

Both pleaded guilty to one count each of manufacturing and delivering marijuana.

Police said the men moved the drugs through Whiteside, Winnebago and Henry counties. A grand jury decided both men would be charged only in Henry County.

Both men were arrested last September in Rockford when police found the drugs in warehouses and storage units in Rockford.

They were both being held in the Henry County Jail on $4.5 million bond each, which was the estimated street value of the drugs.

## 'Major' cocaine seller sent to federal prison

**PEORIA** — A Chicago man was sentenced to more than 15 years in federal prison for being what a judge called a "major" distributor of cocaine.

Simon Lundy, 43, denied taking part in a drug trafficking ring that brought several pounds of both powder and crack cocaine into the Peoria area, but U.S. District Judge Michael Mihm said he didn't believe him. Rather, the judge sided with two inmates who testified Lundy knew more about the operation and the amount of drugs than he let on.

Lundy pleaded guilty the Friday before his trial in September to a single count of conspiracy. He didn't dispute selling drugs; what was at issue during the sentencing hearing was how much drugs were linked to him, said his attorney Jeffrey Flanagan.

It matters because in the federal system, a person's sentence can be enhanced if authorities can tie more drugs to them. Lundy testified he sold drugs to undercover informants twice with each buy being less than an ounce of powder cocaine.

Flanagan argued for a lesser sentence, saying his client accepted responsibility for his actions. But prosecutors and Mihm disputed that. The judge pointed to a report from the U.S. Probation Office that said Lundy distributed several kilograms of powder and several grams of crack cocaine within the one month that he was in the conspiracy.

After Lundy finishes serving his 188-month sentence, he will spend five years on supervised release, the federal version of probation.

## Burglar takes $1,130 from Lou's Drive-in

**PEORIA** — A popular Central Peoria eatery was burglarized early Thursday and more than a $1,000 was taken.

Police were called about 1:50 a.m. to Lou's Drive-In, 4229 N. Knoxville Ave.

A witness heard the security alarm go off at the business and while looking toward the restaurant saw a man run south on Knoxville.

When police arrived, they discovered the burglar gained entry by breaking a window on the south side of the building.

Stolen from an office safe was $1,130, police said. Nothing else was disturbed.

---

## e fatal crash

a, who crashed while driving home retirement party.

l of 19425 County Highway 2100N ood-alcohol content of 0.14 percent rashed April 28 while driving home sheriff's Sgt. Potts said.

## INQUEST

Continued from Page B1

Peoria police Detective Mark Lamb told a Peoria County coroner's jury Thursday. "At this time, we have no reason to believe

10 to 15 years ago, Mr. Hudson did have an addiction to heroin they thought he had overcome," Lamb said.

Hudson's cell phone records revealed a phone number to a known drug house in South Peoria. Police visited the house